TEXAS NATIONAL BANK OF DALLAS, Appellant,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellee.

No. 5458.

Court of Civil Appeals of Texas, Waco.

Aug. 29, 1975.

Crocker & Murphy, Terence J. Murphy, Dallas, for appellant.

Strasburger, Price, Kelton, Martin & Unis, Frank L. Skillern, Jr., James K. Peden, III, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is a suit on a "Banker's Blanket Bond," by a bank against a bonding company. The trial court sitting without a jury held that the bank take nothing against the bonding company, from which the bank appeals. We affirm.

Plaintiff-Appellant Texas National Bank of Dallas (hereinafter called "the bank") brought this suit against Defendant-Appellee Fidelity and Deposit Co. of Maryland (hereinafter called "the bonding company") and Leslie L. Stewart, a customer of the bank. The bank sued Stewart for the unpaid balance due upon his note owing to the bank in the principal amount of $40,326.91 plus 10% interest and attorney's fees (as called for in the note) with an alternative cause of action based upon fraud. The bank sued the bonding company for $40,326.91 plus 10% interest based upon the "Banker's Blanket Bond" known as "Standard Form No. 24" which the bonding company had theretofore issued to the bank.

The trial court sitting without a jury awarded the bank judgment against Stewart for $40,326.91 plus interest and attorney's fees as prayed for; however, the bank was denied any recovery against the bonding company, from which take-nothing judgment the bank appeals.

As of January 5, 1970, Stewart was indebted to the bank in the amount of $65,000.00, consisting of three notes, a $36,000.00 note, a $21,000.00 note renewed on that date, and an $8,000.00 note executed on that date. The proceeds of the latter note were the last monies advanced to Stewart by the bank at any time. The $36,000.00 note was subsequently renewed in March, 1970, and the $8,000.00 note was renewed in April 1970. As of April 13, 1970, Stewart's indebtedness to the bank remained at $65,000.00. On the last-mentioned date Stewart delivered to the bank as collateral for his debts two stock certificates representing 2,000 shares of Graphic Science, Incorporated. Stewart made no payment on his indebtedness at that time. On April 24, 1970, Stewart renewed his $21,000.00 note, and on July 3, 1970, Stewart's three notes were combined into a single note for $65,000.00. On July 31, 1970, Stewart delivered two additional stock certificates representing 2000 shares of the same company, Graphic Science, Inc., these certificates being in the name of Allen Glover to be similarly held as collateral for his debt, which remained at $65,000.00.

Stewart's note was subsequently renewed on November 6, 1970; and on December 24, 1970, Stewart made a payment which reduced the debt to $61,436.21. Thereafter, the balance of the indebtedness was reduced by the disposition of collateral held by the bank, until at the time of trial the balance of the note was $40,326.91.

It is undisputed that the stock certificates representing 4000 shares of Graphic Science, Inc., were forgeries and worthless at all times material to this controversy. Stewart delivered these instruments to the bank at the times above-mentioned because of a threat by the bank each time to call his loans and demand immediate payment thereof. The bank did not discover the forged nature of the certificates until April, 1971.

Appellant bank asserts one point of error contending the trial court erred in failing to render judgment for the bank against the bonding company "after Stewart delivered counterfeit securities to Texas National (Bank) as collateral for his note, loss was effected therefrom and F. & D. refused payment to Texas National under its banker's blanket bond, especially Insuring Agreement (E) which promised payment for such loss." We overrule this point.

The pertinent provisions of Insuring Agreement (E) of the bond in question, (upon which the bank seeks recovery against the bonding company) provides that the bank is indemnified and held harmless for the following:

"(E) Loss (1) *through* the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which proved to have been

(a) counterfeited or forged, as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety, or guarantor or as to the signature of any person signing in any other capacity or . . . ." (emphasis supplied).

By the language thus used, it is only loss occurring *through* the activity described which raises coverage under the bond.

The trial court made findings of fact and conclusions of law, pertinent of which are as follows:

"5. Plaintiff advanced no additional monies to Defendant Stewart after January 5, 1970."

\* \* \* \* \* \*

"7. On or about April 13, 1970, Defendant Stewart pledged to Plaintiff certain stocks as security for his debt, including what purported to be two stock certificates in the name of Defendant Stewart for 1,000 shares each in a company named Graphic Sciences, Inc., which certificates are Plaintiff's exhibits 3 and 4. Said certificates were not genuine but were counterfeit, Defendant Stewart having caused same to be printed. Said certificates were worthless at the time they were pledged and at all times thereafter.

8. At the time of the delivery of said certificates, Plaintiff could not have collected its debt from Defendant Stewart if Plaintiff had called Defendant Stewart's loan.

9. Plaintiff did not sustain a loss through the pledge by Defendant Stewart of the two stock certificates referred to in Finding 7.

10. On or about April 24, 1970, Plaintiff renewed Note 5422 in the amount of $21,000.00. On or about July 3, 1970, Plaintiff renewed all outstanding loans and combined same into one note in the principal amount of $65,000.00.

11. At the dates of said renewals, Plaintiff could not have collected its debt from Defendant Stewart if Plaintiff had not renewed the notes described in Finding 10.

12. Plaintiff did not sustain a loss through the renewals of said notes, even though such renewals were based in part on the counterfeit stock certificates.

13. On or about July 31, 1970, Defendant Stewart pledged to Plaintiff as security for his debt what purported to be two additional stock certificates in the name of Allen F. Glover for 1,000 shares each in Graphic Sciences, Inc., which certificates are Plaintiff's exhibits 5 and 6. Said certificates were not genuine, but were counterfeit, Defendant Stewart having caused same to be printed. Said certificates were worthless at the time they were pledged and at all times thereafter.

14. Plaintiff never received stock powers even purporting to be signed by Allen F. Glover, and even if the stock had been genuine, Plaintiff could not have foreclosed on its pledge of said stock.

15. At the time of the delivery of said certificates, Plaintiff could not have collected its debt from Defendant Stewart if Plaintiff had called Defendant Stewart's loan.

16. Plaintiff did not sustain a loss through the pledge by Defendant Stewart of the two stock certificates referred to in Finding 13.

17. On or about November 6, 1970, Plaintiff renewed Defendant Stewart's note. On or about December 23, 1970, Plaintiff again renewed Defendant Stewart's said note.

18. On the dates of said renewals, Plaintiff could not have collected its debt from Defendant Stewart if Plaintiff had not renewed said notes.

19. Plaintiff did not sustain a loss through the renewal of said notes, even though such renewals were based in part on the counterfeit stock certificates."

Significantly, the trial court determined that the bank did not sustain a loss through the pledges by Stewart of the forged certificates on either of the two occasions hereinabove set out, that is, on April 13, 1970, and on July 31, 1970; and further, that the bank sustained no loss through any of the renewals of Stewart's notes, even though such renewals were based in part on the counterfeit stock certificates. Moreover, the trial court found that the bank could not have collected its debt from Stewart at either of the times he put up the forged certificates as collateral, or at any of the times when Stewart renewed his indebtedness. Appellant bank has not challenged any of these findings of fact. Without detailing the evidence, the trial court's findings have support in the record.

As plaintiff in the trial court, the bank had the burden of proof to establish fact findings to the effect that it (the bank) sustained a loss *through* its acceptance of the forged securities. The bank failed to establish these fact findings in the trial court.

By its single point of error, Appellant bank is contending in effect that the record as a whole shows as a matter of law that the bank sustained its loss through its acceptance of the forged securities. Under the record before us we cannot so hold.

What we have here is a problem of construction of Insuring Agreement (E) of the contract between the parties. What did the parties intend by the language used?

It is factually established that the bank had already suffered the loss before any forged securities were accepted. The bank is saying that because of its acceptance of the forged securities, that it failed to recoup a loss it already had. (It was stipulated that if the forged instruments had been genuine, that they would have been of sufficient value to have paid off the debt.) The bank contends that the bond covers this type loss.

On the other hand, the bonding company argues that this type of loss is not covered by the bond. In effect the bonding company says the type loss contemplated to be covered is that wherein the bank suffers a loss which is *initially* sustained through the acceptance of a forged security, such as, in a case wherein the bank would have loaned Stewart additional or new money on the faith of the forged security.

We are of the opinion that the loss now before us in the case at bar is one not covered by the bond.

■ In construing fidelity bonds, courts follow the liberal rules applicable to insurance contracts rather than the strict rules of suretyship. However, the bond cannot be extended by implication, or enlarged by construction, beyond the actual terms of the agreement entered into by the parties. *Great American Insurance Co. v. Langdeau* (Tex.Sup.Ct.1964) 379 S.W.2d 62.

As stated, the bank's claim for recovery is predicated upon Insuring Agreement (E), which provides for indemnity based upon "Loss *through* the Insured's having_____acquired, accepted or received,_____or_____extended any credit_____on the faith of_____any securities,_____proved to have been_____counterfeited or forged_____." (emphasis supplied).

The word "through" has been defined as: by means of, in consequence of, by reason of, by the intermediary of, and because of. See *Piper, Stiles and Ladd v. Fidelity and Deposit Co. of Maryland* (Houston 1st Tex. Civ.App.1968) 435 S.W.2d 934, NRE.

In the light of our construction of the language used in the bond, as hereinabove set out, we hold that the loss sustained by the bank in the record before us was not covered by the bond. See *Allen State Bank v. Traveler's Indemnity Co.* (La.App.1972) 270 So.2d 270.

Judgment of the trial court is accordingly affirmed.

Affirmed.