# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1090

_____

| | | |
|---|---|---|
| Ohio Savings Bank, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Progressive Casualty Insurance | * | |
| Company, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: October 19, 2007
Filed: April 8, 2008

_____

Before LOKEN, Chief Judge, GRUENDER and BENTON, Circuit Judges.

_____

LOKEN, Chief Judge.

Ohio Savings Bank ("OSB") purchased eleven first-mortgage loans from the Reston, Virginia, branch of Advantage Investors Mortgage ("AIM"), an originator of home-loan refinancings. The transactions were structured as "table funded" settlements. See 24 C.F.R. § 3500.2(b). OSB wired funds to an escrow account of AIM's closing agent, First National Title ("FNT"). The borrowers signed notes and mortgages to AIM as lender; AIM assigned the notes and mortgages to OSB; and FNT was obligated to disburse the loan proceeds from its escrow account in the agreed manner, primarily to satisfy pre-existing first mortgages. Unfortunately, James Niblock, who secretly owned FNT and controlled the AIM branch, employed a Ponzi

scheme to embezzle approximately $1 million from the FNT escrow account after the borrowers' notes and mortgages were executed and assigned to OSB. The scheme's victims were OSB and eight borrowers.[1]  As the borrowers' prior mortgage loans remained unpaid, they refused to pay the mortgage loans assigned to OSB, whose position as secured creditor worsened when the original mortgage documents were lost during the complex unraveling of Niblock's criminal activities. In this action, OSB seeks indemnity for its losses under a bankers blanket bond issued by Progressive Casualty Insurance Co. ("Progressive").[2]  The district court[3] granted summary judgment for Progressive, concluding that the losses were not covered under either of the two bond provisions on which OSB relies. OSB appeals. We affirm.

The bond is a 1986 version of the Financial Institution Bond, Standard Form No. 24, drafted by the Surety Association of America with input from the American Bankers Association. See generally First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971, 977 (7th Cir. 2007). The bond contains six major Insuring Agreements that cover a variety of risks such as misconduct by bank employees; forged, altered, or fraudulent securities and instruments; and counterfeit currency. A

---

[1]In a Ponzi scheme, "one victim's funds are used to pay, appease, or further entice the same victim or additional victims." United States v. Hartstein, 500 F.3d 790, 798 (8th Cir. 2007). Niblock diverted the loan proceeds to his personal use or, when necessary to keep the scheme alive, to satisfy pre-existing liens on earlier mortgages. He pleaded guilty to wire fraud and is serving a lengthy prison term.

[2]OSB filed this lawsuit in Minnesota state court against Progressive and Robert and Jacquelyn Duncanson, borrower victims who are Minnesota citizens. After Progressive removed the action, OSB settled with the Duncansons. 28 U.S.C. § 1352 confers concurrent federal jurisdiction over "any action on a bond executed under any law of the United States." Federal law requires that federally-chartered OSB maintain bond coverage. See 12 C.F.R. § 563.190.

[3]The HONORABLE JOAN N. ERICKSEN, United States District Judge for the District of Minnesota.

bankers blanket bond is not intended to insure the bank against losses from its normal lending activities. Thus, the Progressive bond broadly excludes "loss resulting directly or indirectly from the . . . default upon, any Loan or transaction involving [OSB] as a lender or borrower . . . whether such Loan . . . was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D), or (E)." Another limited exception to this broad exclusion is contained in a rider called the Fraudulent Mortgages Insuring Agreement ("FMIA").

The issues on appeal are whether OSB's losses arising out of Niblock's fraud are covered (i) by the FMIA, or (ii) by Insuring Agreement (E). Like the district court, we will ignore what might be a complex choice of law analysis because the parties have not identified a relevant state law conflict and have relied primarily on Minnesota and Ohio law; ignoring the issue in these circumstances is consistent with Minnesota choice-of-law principles. See State Farm Mut. Auto. Ins. Co. v. Great W. Cas. Co., 623 N.W.2d 894, 896 (Minn. 2001). The interpretation of terms in an insurance contract is a question of law we review *de novo*. Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 175 (Minn 1989); Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm, 652 N.E.2d 684, 686 (Ohio 1995). We agree with the district court that the bond unambiguously precludes OSB's recovery under either the FMIA or Insuring Agreement (E).

## I. The Fraudulent Mortgages Insuring Agreement

While the bond broadly excludes loan-related losses, the FMIA provides coverage for -

> Loss resulting directly from the Insured's having, in good faith . . . accepted or received or acted upon the faith of any real property mortgages . . . or like instruments . . . which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses . . . .

In this case, OSB contends that the borrowers were fraudulently induced to sign the notes and mortgages by representations that the loan proceeds would be used to satisfy their existing mortgage loans. The broad exclusion clearly applies to losses resulting from fraudulently induced notes, but OSB argues that its losses are nonetheless covered by the FMIA because the borrowers' signatures on the mortgages were "obtained through trick, artifice, fraud, or false pretenses," as those words are broadly construed in the law of fraud. Like the district court, we disagree.

The critical flaw in OSB's contention is its lack of focus on the word "defective." Under the FMIA, a loss is covered only if the bank relied on a mortgage that proves to be "defective by reason of the signature thereon . . . having been obtained through trick, artifice, fraud, or false pretenses." Commercial law has long distinguished between common law fraud in the inducement, and fraud "as to the nature and terms of the contract [being] signed." M & M Secs. Co. v. Dirnberger, 250 N.W. 801, 802 (Minn. 1933). The former is a defense against any party with knowledge of the fraud, but only the latter type of fraud, often referred to as "fraud in the factum,"[4] is a defense against a holder in due course of a negotiable instrument. Id. at 803. This distinction is now codified in the Uniform Commercial Code, which provides that a holder in due course is subject only to "real" defenses that include "(iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn *of its character or its essential terms*." Minn. Stat. Ann. §§ 336.3-305(a)(1), (b) (emphasis added).[5]

---

[4]See BLACK'S LAW DICTIONARY 686, *fraud in the factum* (8th ed. 2004) ("Compared to fraud in the inducement, fraud in the factum occurs only rarely, as when a blind person signs a mortgage when misleadingly told that it is just a letter.").

[5]As M & M Securities confirms, OSB's unsupported assertion that Niblock's "illegal embezzlement scheme" provided the borrowers with a "real" defense to a claim by a holder in due course under § 336.3-305 is simply wrong.

Recognizing that the FMIA is a narrow exception to the bond's exclusion of loan losses, we conclude that a mortgage "defective by reason of the signature thereon" is one that fails to provide the promised security interest in real property because the mortgagor was tricked or defrauded as to the nature of the document being signed. A hidden defect of this kind, one that bars recovery by a holder in due course under commercial law and strips a mortgage of its essential nature, is the rare type of fraud one would expect an exception to the broad exclusion to encompass.

The few prior cases interpreting the FMIA are consistent with this conclusion. In deciding a different issue in Jefferson Bank v. Progressive Casualty Insurance Co., 965 F.2d 1274, 1280 (3d Cir. 1992), Judge Becker explained:

> The Rider thus would cover bank losses resulting when the seller of real property fraudulently induces the mortgagor to . . . sign a mortgage by promising that the mortgage will never be enforced, by misrepresenting to the mortgagor that the mortgage covers a different piece of property, or by telling the mortgagor that the document being signed was a contract to purchase rather than a mortgage.

In deciding an issue much like the one before us, a New Jersey state court quoted the above portion of Judge Becker's opinion in holding that the FMIA did not provide coverage. "There is a distinction," the court explained, "between a fraudulent scheme and a fraudulently induced signature. A mortgage may have been induced by fraudulent acts, but the signature may be valid. . . . There is no evidence [in this case] that any mortgagor . . . did not realize he was signing a mortgage." North Jersey Sav. & Loan Ass'n v. Fid. & Deposit Co. of Md., 660 A.2d 1287, 1300 (N.J. Super. Ct. Law Div. 1993). Likewise, in this case the borrowers admitted knowing they were signing mortgages that would encumber their property. Thus, the mortgages were not "defective." Indeed, OSB failed to prove that the borrowers' mortgages were unenforceable due to Niblock's fraud in the inducement, only that the borrowers

refused to pay their mortgage notes. In these circumstances, the district court correctly concluded that OSB's loan losses were not covered by the FMIA.

## II. Insuring Agreement (E)

Insuring Agreement (E) is another exception to the bond's general exclusion of loan-related losses. As relevant here, Insuring Agreement (E) covers a loss "resulting directly from" OSB having "extended credit or assumed liability on the faith of . . . [a] mortgage . . . creating . . . a lien upon, real property . . . which (i) bears a signature . . . which is a Forgery, or (ii) is altered, or (iii) is lost or stolen." "Actual physical possession" of the mortgage by OSB or its authorized representative "is a condition precedent to [OSB] having relied on the faith of [the mortgage]."

OSB argues that Insuring Agreement (E) covers its losses because the original mortgage documents were lost after the mortgages were assigned to OSB, preventing OSB from recording the mortgages. The district court rejected this claim, concluding that "[t]he word 'lost' unambiguously refers to a document that was lost by its true owner before OSB came into possession of the document." We agree.

The plain language of Insuring Agreement (E) focuses on the point in time when OSB made a decision to extend credit. Actual physical possession of the mortgage is a condition precedent because a prudent bank will examine the document's authenticity, and the bankers blanket bond "does not insure good management." Nat'l City Bank, 447 N.W.2d at 177 (quotation omitted); see BancInsure, Inc. v. Marshall Bank, N.A., 453 F.3d 1073, 1075-76 (8th Cir. 2006); Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md., 894 F.2d 1255, 1263-64 (11th Cir. 1990). Insuring Agreement (E) provides coverage if the mortgage bears a forged signature, or is an altered instrument, or is "lost or stolen." In this context, lost or stolen plainly refers to an instrument that has been lost by or stolen from its rightful owner and then used wrongfully to persuade an unsuspecting bank to extend credit.

This interpretation is consistent with every court that has considered the issue. See Resolution Trust Corp. v. Aetna Cas. & Sur. Co. of Ill., 25 F.3d 570, 580 (7th Cir. 1994) ("this language, when read in its context, applies only to securities that have a defect in title at the time of acquisition" by the insured); Bank of the S.W. v. Nat'l Sur. Co., 477 F.2d 73, 77 (5th Cir. 1973); Pine Bluff Nat'l Bank v. St. Paul Mercury Ins. Co., 346 F. Supp. 2d 1020, 1028-29 (E.D. Ark. 2004); Exeter Banking Co. v. N.H. Ins. Co., 438 A.2d 310, 314-15 (N.H. 1981).

Here, the mortgages were not "lost or stolen" instruments when they were assigned to OSB. They were the borrowers' mortgages, and the original documents were not lost until after OSB relied on what was assigned in extending credit to the borrowers. Losing collateral documents after a loan has been made is precisely the sort of practice that is excluded from coverage by a bankers blanket bond. Thus, the district court correctly held that any financial loss to OSB caused by the post-acquisition loss of original mortgage documents signed by the borrowers was not covered by Insuring Agreement (E). Therefore, we need not consider Progressive's additional contentions that OSB did not satisfy the "actual physical possession" condition precedent to coverage under Insuring Agreement (E), and that OSB's financial losses did not "result[] directly" from the loss of the mortgage originals.

The judgment of the district court is affirmed.

_____