Cheshire
No. 90-058

## THE MACMILLIN CO., INC.

v.

## THE AETNA CASUALTY AND SURETY COMPANY & a.

December 31, 1991

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*James C. Wheat* and *Jeffrey H. Karlin* on the brief, and *Mr. Wheat* orally), for the plaintiff.

*Ouellette, Hallisey, Dibble & Tanguay P.A.*, of Dover (*Robert T. Mittelholzer* on the brief, and *Raymond R. Ouellette* orally), for the defendants.

BROCK, C.J. The defendants, the Aetna Casualty and Surety Company and the Standard Fire Insurance Company (collectively

Aetna), appeal from a decree of the Superior Court (*Barry*, J.) requiring Aetna to provide coverage and pay the costs of defense to the plaintiff, The MacMillin Company, Inc. (MacMillin).

On appeal, the defendants argue, *inter alia*, that the trial court erred in finding coverage because MacMillin's business activities at issue in the underlying action fall within a professional services exclusion in its policies. Because we conclude that the trial court's ruling on this issue was in error, we need not consider questions raised by Aetna's reliance on other exclusions in its policies.

The incident giving rise to this petition occurred in 1985–86 when MacMillin constructed a production facility for the Filtrine Manufacturing Company and J.P.C.D., Inc. (Filtrine). Following completion, the floor of the facility cracked, causing damage to equipment, necessitating repair of the floor and resulting in loss of use of the facility. MacMillin brought an action against Filtrine seeking to recover the sum of $36,924 remaining unpaid under the contract. Filtrine counterclaimed, alleging breach of contractual duty by MacMillin as architect, engineer and contractor; inadequate design and specification; and improper construction. During trial, the lawsuit was settled by MacMillin's agreeing to pay Filtrine $250,000.

At all times relevant to these events, MacMillin held two Aetna Comprehensive General Liability Insurance policies and two Aetna Excess Indemnity policies. However, prior to trial and settlement of the actions, Aetna denied plaintiff's requests for defense and coverage of Filtrine's claims, relying upon several exclusions in the policy, including the following professional services provision:

> "(B) The insurance afforded with respect to liability assumed under an incidental contract is subject to the following exclusions:
>
> . . .
>
> (2) if the insured is an *architect, engineer or surveyor*, to bodily injury or property damage arising out of the rendering of or the failure to render professional services by such insured, including
>> (a) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and
>> (b) supervisory, inspection or engineering services."

(Emphasis added.) Aetna argues that Filtrine's claims are not covered under the policies because MacMillin provided professional

services as architect/engineer for the construction of the facility. MacMillin responds that it is not an engineering/architectural firm and that these services were incidental to its role as "general contractor."

"[F]inal interpretation of the language in an insurance policy is a question of law . . . [for] this court to decide." *Curtis v. Guaranty Trust Life Ins. Co.*, 132 N.H. 337, 340, 566 A.2d 176, 178 (1989). "[W]e construe the language of an insurance policy as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole." *Haley v. Allstate Ins. Co.*, 129 N.H. 512, 514, 529 A.2d 394, 396 (1987). In reviewing the record, we note that the contract between MacMillin and Filtrine specifically provided that the contractor (MacMillin) would serve as architect/engineer. The record is replete with testimony that MacMillin did not enter into any sub-contract for design and engineering services, but rather provided these professional services itself, in addition to the work it undertook as general contractor. Upon a thorough reading of the insurance policy and the record on appeal, we rule that the express language of Part I(B)(2) excludes from coverage Filtrine's claims against MacMillin. Accordingly, we hold that the trial court erred in ruling that the professional services exclusion does not apply.

We note also that the trial court erroneously found that Part I(A) of the Broad Form Comprehensive General Liability Endorsement and Exclusion (B)(2) are ambiguous. Part I(A) reads:

"I. CONTRACTUAL LIABILITY COVERAGE
    (A) The definition of incidental contract is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business."

The court reasoned that because the architectural and design work were incidental to the construction contract, Part I(A) covering incidental contracts and Exclusion B(2) for professional services were mutually contradictory and therefore ambiguous. "When interpreting an insurance contract, we will determine its meaning 'based upon the meaning that would be attached to it by a reasonable person.'" *Spaulding v. Concord Gen. Mut. Ins. Co.*, 122 N.H. 515, 516, 446 A.2d 1172, 1173 (1982) (quoting *Exeter Banking Co. v. N.H. Ins. Co.*, 121 N.H. 1083, 1086, 438 A.2d 310, 313 (1981)). "[P]olicy terms can create ambiguity as to coverage only when the parties may reasonably differ about their interpretation." *City of Manchester v. General*

*Reinsurance Corp.*, 127 N.H. 806, 809, 508 A.2d 1063, 1065 (1986) (citation omitted). "We will not force language to create an ambiguity in order to resolve it against the insurer, when it is clear from contextual analysis that no coverage was intended." *Id.*

We read the policy with this standard in mind, and "determine what is reasonable by considering [the] policy as a whole and on the basis of a more than casual reading, evaluating any claimed ambiguity by reference to the context in which the relevant language occurs." *Id.* (citations omitted). In the case of exclusions from coverage, "the insurer must clearly state the exclusion in conjunction with whatever sections it is intended to modify." *Commercial Union Assurance Cos. V. Gollan*, 118 N.H. 744, 749, 394 A.2d 839, 843 (1978).

We conclude that the professional services exclusion is expressly written to modify Part I(A). Although MacMillin is not an architectural or engineering company, its contract with Filtrine expressly provided for those services. Therefore, this contract clearly falls within Exclusion B(2). We fail to see how the two provisions are in any way ambiguous or could lead MacMillin to reasonably conclude that it would be covered for its contract with Filtrine providing for architect/engineer services. Accordingly, we hold that the trial court erred in finding an ambiguity.

*Reversed; judgment for the defendants.*

JOHNSON, J., concurred specially in support of the majority opinion; THAYER, J., concurred; HORTON and BATCHELDER, JJ., dissented.

JOHNSON, J., concurring specially: I concur with the opinion of the Chief Justice but would add the following reason. In my view it is not enough, as the dissent suggests, for The MacMillin Co., Inc. to simply file their petition for declaratory judgment seeking insurance coverage and say to the trial court, "here's the writ, and our policies cover the claim." It is my belief that the insured has a duty to draw a roadmap for the trial court through the labyrinth of policies, with their twists and turns, to aid the trial court in determining coverage. This is hardly too much to expect of an insured who desires to have its insurance company pay for a loss. Further, it gives the trial court the opportunity to consider the issue of coverage after a full consideration of the insured's position. I would hold that it is the duty of the

insured to outline for the trial court what were "the reasonable expectations of the policyholder." *Town of Epping v. St. Paul Fire & Marine Ins. Co.*, 122 N.H. 248, 252, 44 A.2d 496, 498 (1982). The trial court was never given the opportunity to consider the reading of the policies by which the dissent finds coverage. I would find in favor of the insurance company because the interpretation urged by the dissent was not considered by the trial court.

A second reason must be advanced in opposition to the dissent's view that it is the court's, and only the court's, duty, without assistance from the parties, to comb the insurance policies to determine coverage or non-coverage. Under the dissent's proposed procedure for resolving these issues, either the insured or the insurance company could discover that coverage or non-coverage had been determined, by the trial court or this court, upon a reading of the policy *never* advocated by the winning party, and where the losing party has *never* been given an opportunity to argue against the court's interpretation of the insurance contract. That would result because the issue of how coverage either existed, or did not exist, had never been joined. Thus, no meaningful advocacy of the coverage issue would have been afforded the parties. Such a procedure turns procedural due process and legitimate argumentation, as we have known it and applied it in this State for centuries, on its head.

HORTON, J., dissenting: My problem with the majority opinion goes beyond the words written above. Were that text all that was involved in the case, I would be found happily embracing that opinion. I differ, however, in my analysis of the scope of review of the trial court's order. How far should this court go to determine the existence or non-existence of coverage under an insurance policy found in the record of a declaratory judgment proceeding? Are we limited to the issues raised and determined in the trial court order? Are we limited to issues clearly raised and argued by the parties? Or, having the facts before us, and the written contract spread on the desk, are we not bound to read the document and to determine, as a matter of law, whether or not there is coverage available to the insured?

I would adopt the latter alternative as the proper scope of review and raise it to the level of an obligation. This obligation is particularly strong when our decision strips coverage from the insured. "The general rule is that the court will honor the reasonable expectations of the policyholder." *Town of Epping v. St. Paul Fire & Marine Ins. Co.*, 122 N.H. 248, 252, 444 A.2d 496, 498 (1982). We construe the language of an insurance policy as would a reasonable person in the

position of the insured based on a more than casual reading of the policy as a whole. *Haley v. Allstate Ins. Co.*, 129 N.H. 512, 514, 529 A.2d 394, 396 (1987). "[W]e must consider *the policy as a whole."* *Andrews v. Nationwide Mut. Ins. Co.*, 124 N.H. 148, 153, 467 A.2d 254, 257 (1983) (emphasis added). We must keep in mind that the burden is on the insurer to show that no coverage exists. RSA 491:22-a; *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 250 (1983). The burden is on the insurer to prove the negative. The insurer must eliminate all contractual awards of coverage. This burden carries through to appeal, and its satisfaction is measured by a more than casual reading of the policy as a whole.

There were four material policies in this case. Since two ran seriatim to two, and the material terms of each set were acknowledged by the parties to be identical for our purposes, we are really dealing with two contracts of coverage. The first is a comprehensive general liability policy with broad form endorsement. The second is an excess indemnity (umbrella) policy. Although the latter is written in consideration of the existence of the former, they are separate policies with different coverages and different exclusions. Coverage was sought under both policies for defense and indemnification on an underlying liability claim by The Filtrine Manufacturing Company and J.P.C.D., Inc. *See* Cheshire County Superior Court No. 86-C-064. The underlying liability claim sounded partly in contract, not material to this dispute, and partly in negligence. The negligence claims asserted defective design and improper construction. Damages were sought for property damage and loss of use. The insured brought a declaratory judgment action, during the pendency of the liability case, seeking to be defended and indemnified against any resulting loss. Its petition essentially said, "here's the writ, and our policies cover the claim." The insurance company responded, denying coverage and alleging the existence of exclusions material to both design and construction.

The trial court decided the case, finding coverage and specifically rejecting applicability of an exclusion from contractual liability coverage relating to design. Prior to this decision, the underlying liability case was settled by the insured with no findings of liability or the nature of the liability. The insurance company appealed the coverage decision.

The majority reverses the trial court, finding the design exclusion to contractual liability coverage to be valid and unambiguous. I agree with that finding and the result reached by the majority; how-

ever, I would find other coverage applicable, and would remand and order further proceedings to determine whether this coverage applies to require reimbursement for the defense, as far as it went, and what, if anything, in the settlement is appropriate for indemnification.

The majority decision has dealt with one liability claim (design) arising under one policy (comprehensive general liability, as endorsed). The design claim under the umbrella policy has been ignored by both the trial court and this court. The defective construction claim under both policies was not addressed.

Reading the policies as a whole, I agree with the trial court that there is coverage in the first instance under both policies. I agree with both the trial court and the majority that the insurer's obligation should be based on coverage for contractual liability. Contractual liability coverage is afforded under the comprehensive general liability policy, as endorsed. The majority is correct in finding that coverage for design liability is unambiguously excluded from this coverage. It would appear that defective construction liability coverage is also excluded by the infamous exclusion "o" (property damage to work performed by the insured). However, this exclusion "o" has been held to be ineffective when appearing with the language we find in the comprehensive general liability policy. *Commercial Union Assurance Cos. v. Gollan*, 118 N.H. 744, 394 A.2d 839 (1978) (exclusion (a), as broadened by the endorsement, affords backdoor coverage for unworkmanlike performance which is fundamentally inconsistent with exclusion "o"). In this case, exclusion (2)(d)(iii) of part VI of the Broad Form Comprehensive General Liability Endorsement replaced exclusion "o". However, the replacement is no more consistent nor clear than exclusion "o" was. The heading of the section in which it appears is "VI Broad Form Property Damage Liability Coverage." The grant of coverage for contractual liability is founded on a three-step trek through the policy and its broad form endorsement. Exclusion 1(a) states:

"This insurance does not apply:
(a) to liability assumed by the insured under any contract agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products *or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner.*"

Therefore, after reading the first page of his policy, the insured has reason to be optimistic about his coverage in the event that his work-

manship is faulty. Both of the exceptions to Exclusion 1(a) appear to embrace a claim for defective workmanship. The Broad Form addendum broadens the definition of an "incidental contract" to include "any oral or written contract or agreement relating to the conduct of the named insured's business." At this point the prospect of coverage is quite encouraging indeed. Not until page 3 of the addendum does the provision purporting to divest the insured of the specifically granted coverage appear, in a most inauspicious place and manner. This is the very essence of ambiguity. The backdoor coverage for warranties on work performed is logically inconsistent with exclusion of coverage for faulty workmanship. Although I have some reservations concerning this treatment of exclusion "o", I am driven by *stare decisis*, and the fact that the *Gollan* language existed for most of the decade after *Gollan* without correction, to find coverage for the defective construction claim under the basic policy.

In contrast, the umbrella policy does not include the backdoor warranty coverage language and has a nice clear exclusion to property damage coverage, that appears directly below and on the same page as the grant of coverage, in a section headed "Exclusions."

> 2.2 Exclusions. This policy does not apply:
> "(e) to property damage
>
> . . .
>
> (3) to work performed by the named insured arising out of the work or any portion thereof, . . . if such property damage occurs after such work has been completed or abandoned and occurs away from premises owned by or rented by the named insured."

The umbrella policy should serve as the model for clarity in this area.

For the defective construction claim, I would find no umbrella coverage. The umbrella policy does not include any design exclusion. The grant of coverage is broad enough to include contractual liability, and there is no limitation on such coverage. I would find umbrella coverage for the design liability. An umbrella policy has two purposes. The first is to increase the dollar amount of coverage afforded to the insured. The second is to provide coverage for risks not covered in underlying liability policies. The MacMillin Company, Inc. had a reasonable expectation that its umbrella coverage filled the design coverage gap in its underlying coverage.

Reading the policies as a whole discloses coverage for both of the negligence claims. The underlying liability case, however, included

uncovered claims. The case was settled by the insured. Issues material to the obligation to defend and the obligation to indemnify are unresolved. I would reverse, finding coverage as outlined above, and remand to the trial court for a determination of what this coverage means in terms of money.

BATCHELDER, J., joins in the dissent.